IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 13, 2010

## RONALD E. CROOK v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-08273     Chris Craft, Judge**

**No. W2009-02230-CCA-R3-PC  - Filed June 13, 2011**

Petitioner, Ronald Crook, appeals the dismissal of his petition for post-conviction relief in which he alleged that he received ineffective assistance of trial counsel because counsel failed to properly cross-examine the State's witnesses and investigate the facts of his case. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Brett B. Stein, Memphis, Tennessee, for the appellant, Ronald E. Crook.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons,  District Attorney General; and Chris West, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

### I.  Background

Following a jury trial, Petitioner was convicted of driving under the influence (DUI), first offense, and reckless driving.  He was sentenced to concurrent sentences of eleven months, twenty-nine days, to serve four days, for each conviction.  On appeal, this Court affirmed the convictions and sentences. *State v. Ronald Crook*, No. W2005-02476-CCA-R3-CD, 2006 WL 3516216 (Tenn. Crim. App., Dec. 6, 2006) *perm. app. denied* (Tenn., May 21,

2007). The facts surrounding Petitioner's convictions were summarized by this Court on direct appeal as follows:

The facts as developed at trial establish that on July 30, 2004, Landon and Therese Despeaux were taking their family out to eat when Mr. Despeaux looked in his rear view mirror and saw that a car had hit a telephone pole. Despeaux intended to return to the accident scene and check on the driver, but, before he could do so, the driver put his car in reverse and drove back onto the street into traffic. Mr. Despeaux proceeded to the restaurant and, upon entering the parking lot, noticed that the car involved in the wreck had followed him onto the parking lot and parked next to the Despeauxs' van. The driver, identified as the Appellant, got out of the car, accusing Mr. Despeaux of causing the accident. The Appellant then briefly returned to his car to get a note pad to record the license plate number of the van. At this point, Mr. Despeaux told his wife to call the police. The Appellant immediately returned and wrote down the van's license plate number and continued the confrontation with Mr. Despeaux on the sidewalk outside the restaurant. When the police arrived, Mrs. Despeaux took their three children inside the restaurant and waited for the Appellant to leave.

Patrol Officer Robert McKenzie and his partner, Officer Darrell Felton, were dispatched to the restaurant parking lot and arrived at the scene around 7:00 P.M. Officer McKenzie testified that there was some body damage to the right, front side of the Appellant's car and that it had a flat tire. He concluded that the effects of alcohol were "obvious" based upon a strong odor of alcohol about the Appellant; that his eyes were "bloodshot, watery and sleepy"; that his speech was kind of mumbled like the "slurred speech of somebody's [sic] that's been drinking"; and that he appeared to be unsteady on his feet. Officer McKenzie called a DUI officer to administer the field sobriety tests.

Officer Felton testified that, when they arrived, the Appellant and Mr. Despeaux were standing outside their vehicles. Officer Felton interviewed the Appellant, who was adamant that Mr. Despeaux had caused the accident. Officer Felton concluded that the Appellant's ability to drive was impaired based on the Appellant's "demeanor, and appearance, his speech and odor of alcohol."

Officer C.A. Lewis, a DUI instructor and Field Training Officer certified in the use of the Intoxilizer 1400, was dispatched to the scene. She noted that the Appellant had an odor of an intoxicant about him; that his eyes were bloodshot

and watery; that his speech was "thick-tongued and slurred"; and that his walk from the car was "staggering and swaying." She administered two field sobriety tests. The first was the "one-leg stand" test, which the Appellant started to perform. However, he then said he did not want to do it, and the test was stopped. The second test was the "heel-to-toe" test, and the Appellant promptly stepped off the line and lost his balance on the turn. Officer Lewis concluded that the Appellant was under the influence of alcohol. The Appellant testified that he could not perform the tests because he had diabetic neuropathy in his feet and was required to wear special shoes, although he was not wearing them that day. The Appellant submitted to an Intoxilizer 1400 breath test, with the test results establishing a blood alcohol level of .15 percent.

Officer McKenzie transported the Appellant to "the Med" to see if he needed medical treatment for his diabetes. One of the staff took a blood sample and cleared the Appellant to be taken to the jail. The hospital did not give the Appellant any medication or treatment.

The Appellant testified that he was not intoxicated when he arrived at the restaurant, but he admitted that, by the time the police arrived, "[he] was inebriated." He explained that after he wrote down the Despeauxs' license plate number, he sat in his car, poured two twenty-four-ounce cans of beer into a water bottle, and "guzzled" it. During the twenty minutes that the Appellant was waiting to take the Intoxilizer test, he talked to Officer Lewis, but he did not tell her or the other officers that he had just consumed two, twenty-four-ounce cans of beers.

The Appellant further testified that the officers misinterpreted the symptoms of low blood sugar, which resulted from his diabetes, as evidence of intoxication. He testified that low blood sugar caused him dizziness, confusion, and lack of motor skills. Additionally, the Appellant testified that he had been diagnosed as suffering from depression and receives disability because of it. He took Prozac twice a day, and the package had a label that warned him not to drink alcohol while taking the medication.

The Appellant stated that around 11:00 A.M., he ate lunch at home and went to a gym to exercise. On the way home, he purchased two forty-ounce bottles of beer. Over the next four hours, he drank one and one-half bottles of the beer he purchased. Around 5:30 P.M., he stopped at a supermarket and bought the twenty-four ounce cans of beer, which he contends he "guzzled" while waiting

-3-

for the police at the restaurant parking lot. Based upon the Appellant's admissions, he consumed 108 ounces of beer between approximately 1:30 P.M. and 7:00 P.M., including his assertion that forty-eight ounces of the beer was consumed on the restaurant parking lot.

Both Mr. and Mrs. Despeaux testified that, with the exception of approximately thirty seconds when the Appellant retrieved a notepad from his car, he was continuously in their presence until the police arrived and, that at no time did they observe the Appellant drinking beer.

The Appellant testified that he was on his way home when a maroon van ran a stop sign, and he had to slam on his brakes to avoid an accident. In trying to avoid the accident, the Appellant hit a telephone pole, blowing out his tire and causing steam to pour out of his radiator. According to the Appellant, he then backed up and drove onto the street, following the van so that he could get its license plate number. He followed it down S. Perkins Rd., down Cole Rd., down St. Nick Dr., and through a parking lot to the Erin Way Shopping Center. He testified that he called his father to pick him up and he did not intend to call the police that night.

Doyle Crook is the Appellant's father, and he testified that at 6:30 P.M., on July 30, 2004, he received a phone call from his son, who said he had been involved in an accident and needed a ride home. Mr. Crook and his wife went to the restaurant to pick up the Appellant. Mr. Crook noticed that the right front tire was flat and that the right front fender was dented. They left the car there for the night. Mr. Crook also testified that the Appellant is a diabetic and receives social security disability benefits.

*Id*. at *1-2.

## II. Post-Conviction Hearing

Petitioner testified that trial counsel failed to investigate his case and obtain the names and addresses of three children, ages eleven, eight, and four, who were in the Despeaux's van at the time of his accident. Petitioner claimed that the children were witnesses to the accident and would have impeached Mr. and Mrs. Despeaux's testimony at trial because children "tend to tell the truth." He said:

They - - they witnessed - - the scenario of the accident was that I saw Mr. - - the driver of the vehicle, whoever that was, I didn't know at the time, run the

-4-

stop sign, which forced me to slam on my brakes, and slide on wet pavement, just missing by a couple of inches their back bumper. And I slid into a curb, over the curb, and hit a telephone pole. My knee jerk reaction was to look to the left, which was the direction they were going, south, and they were already near another street, another block down. The reason I was able to just barely miss them is once they cut me off, they had to stop behind another car, which was about to turn left onto Shady Grove. So, they had - - they pinned themselves in for just a moment. Had they not been pinned in, they would have proceeded, and I would have not had my wreck.

Petitioner testified that he asked trial counsel at least three times to find out if anyone other than Mr. and Mrs. Despeaux was in the van at the time of the accident. He said that he was parked three spaces from the Despeaux van in the shopping center parking lot after the wreck, and he saw a woman holding a young girl's hand near the van.

Petitioner testified that he and trial counsel had a brief discussion after each court appearance. He said that trial counsel was supposed to prepare a time line, but it was never completed. Petitioner testified that he met with trial counsel on May 5, 2005, and they "went across the hall to the public defender's office and in a little cubbyhole there, we watched the police arrest video on me." He again reminded trial counsel to "investigate about the kids." Petitioner claimed that trial counsel told him that he was on his own at trial, and Petitioner began worrying about how prepared he would be at the trial that was scheduled to begin on July 11, 2005. Petitioner testified that he was unable to reach trial counsel after their May 5th meeting and left him several messages.

Petitioner felt that trial counsel was ineffective in trying to impeach the Despeauxs during cross-examination on the exact location of their van when police arrived at the parking lot and various other parts of their testimony. He said that he passed trial counsel approximately ten questions during trial, written on little yellow pieces of paper, that he wanted trial counsel to ask, and trial counsel only asked one of the questions. Petitioner testified that trial counsel also failed to properly cross-examine Officer McKenzie about whether Petitioner told him that he drank two beers shortly before officers arrived. He also wanted trial counsel to impeach the testimony of Officers McKenzie and Felton as to whether they searched his car. Petitioner testified that trial counsel did not spend enough time with him to prepare for the case, and failed to respond to his phone calls and letters. He said that trial counsel did not file a motion for discovery until the day of trial and if the motion had been timely filed, he would have received the names of the children who were in the van.

On cross-examination, Petitioner testified that prior to trial, he did not know that there were children in the Despeauxs' van and that he first heard Mrs. Despeaux mention the three

children and their ages at his trial on July 11, 2005. Petitioner admitted that he wrote Mr. Despeaux a letter dated October 30, 2004, which stated: "Additionally, your child was in the vehicle with you and I implore the Court to allow me to serve the child with a subpoena." Petitioner claimed that he did not actually know that a child was in the vehicle when he wrote the letter and that it was speculation on his part because he had observed a woman holding a child's hand near the Despeaux van.

Petitioner admitted that he was driving on the day of the accident and that he had been drinking earlier in the day. He also said that he was in his car drinking after the accident, and he admitted that his vehicle was operable after the accident and while in the parking lot. Petitioner testified that he filed many pro se pleadings in his case and purposely attempted to bypass trial counsel.

Trial counsel testified that he had been a licensed attorney in Tennessee for twenty-three years and had been with the Public Defenders' Office since 1995. He said that his usual practice when receiving a new case was to "go through the discovery, talk with the client, get his version, talk with the State, do whatever investigation is appropriate based on the case." Trial counsel testified that he did not file formal discovery motions. He said: "[The prosecutor] gave me open file discovery, also I believe he gave me Jinx [sic] and give [sic] me copies of Jinx [sic] material and I also - - he also shared with me his conversations with the witnesses in the case."

Concerning Petitioner's demeanor, trial counsel stated:

My conversations with Mr. Crook somewhat mirrored his testimony in that I had a great deal of difficulty getting him to focus on what I felt was relevant. We had a [sic] completely divergent opinions as to what was important in the case and what was not.

He seemed extremely focused on something that happened in - - at the Young Avenue Deli where he wanted me to subpoena and investigate a Rock 103 disc jockey, I think it was Mad Dog or somebody, Bad Dog or Mad Dog or something, I don't recall.

And apparently there were [sic] some incident there where he was expelled from the deli and that something happened with him and Bad Dog, and this happened a couple of hours before this incident with the - - with the Despeaux's and, of course, in another part of town. And there was an issue there, I think he was concerned about calling all that and trying to make that an issue in the trial.

-6-

Of course the only issue I was concerned about was whether he - - whether he had been drinking at the Young Avenue Deli, but - -

Trial counsel obtained Petitioner's version of what happened at the deli, and he told Petitioner that he did not feel that the incident was relevant and should be excluded at trial because he felt that it would be harmful to the case. The State agreed not to bring up the issue at trial.

Trial counsel testified that he did not attempt to interview the Despeaux's children, and he felt that it was a side issue. He said:

I don't remember. Mr. Bearup, you know, better than I but I may have discussed the children with him at some point as well. And I trust - - frankly I trust Mr. Bearup enough that he would tell me the truth, and I'm sure that either he told me - - either I didn't discuss it with him or I discussed it with him and he told me that he talked with the Despeaux's and they didn't know anything or didn't have any testimony or anything.

But I - - no, I did not talk to the children directly. I don't think Mr. Bearup talked with the children directly either but I'm not sure about that.

Trial counsel testified that there were issues about discrediting the Despeauxs' by saying that "the windows were tinted or weren't tinted," whether Petitioner made phone calls or other things that trial counsel could not "imagine children of that age would remember six months later."

Trial counsel testified that he did not tell Petitioner that he was "on his own"at trial. He said that they watched the video together, and he told Petitioner that in his opinion, the "video was going to convict him or acquit him, and I thought it was a bad video." Trial counsel explained that the video "was very probative of [Petitioner] at least being inebriated at the time." He also felt that Petitioner's story of drinking forty-eight ounces of beer while waiting for police to arrive was "somewhat hard to believe." Trial counsel testified that he told Petitioner that he did not feel there was anything to lose by going to trial because he "didn't think Judge Beasley would give him much more, if anything, you know- - minimum offer that's the - - the minimum." He said that Petitioner was sentenced to eleven months, twenty-nine days, to serve four days, and the remainder on probation.

Trial counsel felt that he was prepared for trial, and he did not feel that there were any additional motions that needed to be filed. He read all of the questions that Petitioner passed to him during the trial. He did not ask some of the questions because in his judgment, he

either did not like the possible answer or he did not feel that they were relevant. Trial counsel testified that in some cases, those type of questions either hurt a case or are clearly objectionable. Trial counsel said that he was impressed with Petitioner's father and called him as a witness. He cross-examined the State's witnesses and felt that he asked questions that were appropriate and in Petitioner's best interest.

On cross-examination, trial counsel testified that he spoke with Petitioner in the conference room beside Division 10 several times on report dates. They also went to his office after court on one occasion, and they watched the video in his office. He felt that the issue in Petitioner's case was whether Petitioner was under the influence at the time he was driving because his testimony was that he drank four beers after the accident while waiting for police to arrive. Trial counsel testified that he told Petitioner that it was his decision as to whether to testify at trial, but trial counsel did not feel that there was any reason for Petitioner not to testify.

Trial counsel testified that he thought that Petitioner's father was called as a witness to testify about how Petitioner sounded on the phone and Petitioner's condition when his father arrived on the scene after the accident. Trial counsel could not recall the ages of the children in the Despeaux van, but he thought that one of them was over the age of ten. He did not attempt to question the children, and he did not feel that Mr. and Mrs. Despeaux would have allowed him to question the children. He also thought that he "flat out" told Petitioner that he was not going to question them. Trial counsel agreed that he questioned one of the officers at trial about whether Petitioner had told him that he had been drinking at the Young Avenue Deli prior to the accident. He thought that he asked the officer about the deli because there was some reference to it in the video that was already in the record.

Scot Bearup, the prosecutor in Petitioner's case, testified that trial counsel had open file discovery, and he "copied basically every piece of paper that was in there that was relevant to the matter." He said: "I provided to him matters or documentation that he would not normally have pre-trial such as Jencks material." Mr. Bearup testified that he spoke with Mr. and Mrs. Despeaux before trial, and he shared their conversations with trial counsel. He said there were no secrets at trial, and trial counsel knew "everything that the State intended to put on." Mr. Bearup testified that he and trial counsel discussed the incident at the Young Avenue Deli, and Mr. Bearup spoke with the manager. No one could recall if Petitioner actually consumed any alcohol there or if he had eaten, so Mr. Bearup agreed not to bring up the fact at trial that Petitioner had been asked to leave the deli. Mr. Bearup thought that the matter was brought up at trial when one of the officers testified that Petitioner told them that he had been drinking at the Young Avenue Deli. Petitioner then testified that he did not have anything to eat or drink at the deli, and there was no mention of him being removed from the

business.  Mr. Bearup testified that he gave all of the information that he obtained from the Young Avenue Deli to trial counsel.

On cross-examination, Mr. Bearup testified that he watched the video both before and during trial, and he did not recall if there was a mention of the Young Avenue Deli incident. However, he said that it was possible since Petitioner was obviously intoxicated in the video, and he was "all over the place . . ."  Concerning Petitioner's trial testimony, Mr. Bearup stated:

> Mr. Crook's testimony was is [sic] that after he had driven his wrecked car to, I believe it was Holiday Ham on Erin Way in pursuit of the Despeaux's, that he looked at the damage to his car and was so distraught by that that he went into the trunk of his car, got a water bottle, an empty water bottle, filled it up with two - - I want to say they were quart bottles, I believe they were 40 ounce bottles of beer each, filled up the water bottles and proceeded to sit in his car in the rain because he had a window that did not fully go down, and consumed that beer prior to the police arriving.

## III.  Standard of Review

Initially, Defendant's brief in this matter is inadequate to allow a meaningful review of the issue that he raises.  Defendant's entire argument consists of the following:

> Post Conviction Relief may be granted if it can be shown that a defendant's due process rights were violated as guaranteed by Article I, Section 9 of the Tennessee Constitution and the due process clause of the United States Constitution.  Tenn. Code Ann. 40-30-103 (2007); see also, *Shabazz v. State*, 2001 Lexis 756 (Tenn. 2001); *Archer v. State*, 851 SW2d 157 (Tenn. 1993); *Overton v. State*, 874 SW2d 6 (Tenn. 1994).

> For all of the above reasons the appellant respectfully submits that based upon the above facts and the applicable law, he was denied effective assistance of counsel.

Rule 27(a)(7) of the Tennessee Rules of Appellant of Procedure states that an appellant's brief shall contain the following with respect to an argument:

> (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require

appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and

(B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues)[.]

Tenn. R. App. P. 27(a)(7)(A)-(B). Under Rule 10(b) of the Rules of the Court of Criminal Appeals, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this Court." Defendant's argument does not contain any references to the record or the reasons why his contentions require appellate relief. In any event, we will briefly address the issue raised by Defendant.

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. T.C.A. 40-30-210(f). The trial court's application of the law to the facts is reviewed *de novo,* without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to *de novo* review. *Id*.; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id*. at 690, 104 S.Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn.1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id*. Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court

need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

### A. Failure to Properly Coss-Examine the State's Witnesses

Petitioner first argues that trial counsel was ineffective for failing to properly cross-examine the State's witnesses. Concerning this issue, the post-conviction court held:

> The petitioner did not produce any question in his testimony at the hearing on this petition that he felt should have been asked that was not. When pressed repeatedly to answer this question and repeatedly avoiding a direct answer during cross-examination, he became visibly irritated on the stand and finally stated "Well, I'm not a lawyer. How am I supposed to know what to ask?" (Transcript of the May 14, 2009 Hearing, p. 29). He seems to feel that somehow the "perjury" of the state's witnesses should have been exposed, but he fails to suggest a question which would have produced that result. Contrary to his hearing testimony, a careful reading of the trial transcript reveals no inconsistencies in the testimony of any of the state's witnesses. The only inconsistencies in any testimony at trial was the petitioner's testimony when compared to his statements on the video, which he explains were caused because he was "inebriated" due to the beers he drank while waiting for the police. This court finds his attorney did as thorough a job as he could, given the facts of the case. As his attorney testified, little would have been gained by repeating the same questions over and over.

The record in this case does not preponderate against the post-conviction court's findings. Trial counsel testified that he read all of the questions that Petitioner passed to him during the trial. He did not ask some of the questions because in his judgment, he either did not like the possible answer or he did not feel that they were relevant. At the post–conviction hearing, Petitioner did not present any questions that trial counsel should have asked, and he does not present this Court with any argument as to the questions that should have been asked or how trial counsel failed to properly cross-examine the State's witnesses.

We conclude that Petitioner has failed to show that trial counsel's assistance fell below acceptable standards or that Petitioner was prejudiced by any aspect of his trial counsel's assistance on this ground. Petitioner is not entitled to relief on this issue.

### B. Failure to Properly Investigate Petitioner's Case

Petitioner contends that trial counsel was ineffective for failing to investigate his case. However, the record does not support this claim. At the post-conviction hearing, Petitioner's main argument was that trial counsel should have discovered the names of the Despeauxs' three minor children because they may have witnessed the accident. Concerning this issue, the trial court held:

As mentioned in the preceding allegation, these children were never called as witnesses at the hearing on this petition. In *State v. Pylant*, 263 S.W.3d 854, 869-70 (Tenn. 2008), our Supreme Court held that

[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . .the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id*.

Therefore, no prejudice has been shown in the failure to call these witnesses at trial. In addition, the petitioner's trial attorney testified at the hearing on this petition that he doubted the children's parents would have allowed him to interview them prior to trial, and there is no reasonable probability that children that age would have been looking through the tinted rear window of the SUV and would have seen or remembered anything of value. This allegation is meritless.

Again, the record in this case does not preponderate against the trial court's findings. The Petitioner has not shown or even argued how trial counsel's performance in this area was deficient. As noted by the trial court, Petitioner did not call any of the children as witnesses at the post-conviction hearing to show what their testimony would have been. Even if the children had testified that they saw the accident and that Mr. Despeaux ran a stop sign, it is irrelevant as to whether Petitioner was driving under the influence of an intoxicant at the time of the accident or when he followed the Despeaux van after the accident. Trial counsel testified that he did not attempt to interview the children because he thought that it was a "side issue." He also could not imagine children of that age remembering six months later what they saw at the time of the accident. Trial counsel thought that he "flat out" told Petitioner that he was not going to question the children, and he did not feel that Mr. and Mrs. Despeaux would have allowed him to question the children in light of the civil suit filed against them by Petitioner.

Petitioner has not shown any other deficiency in trial counsel's investigation of his case. Trial counsel received open file discovery from the State, and he received Jencks material. The prosecutor also shared the content of his conversations with witnesses. Trial counsel investigated an incident at the Young Avenue Deli and entered a stipulation with the State to exclude testimony that Petitioner had been kicked out of the deli prior to the accident. Trial counsel met with Petitioner, and they also viewed the video tape of Petitioner's arrest. Trial counsel felt that he was prepared for trial, and he did not feel that there were any additional motions that needed to be filed.

We conclude that Petitioner has failed to show that trial counsel's assistance in this asserted ground fell below acceptable standards or that Petitioner was prejudiced by any aspect of his trial counsel's assistance. Petitioner is not entitled to relief in this appeal.

**CONCLUSION**

After a thorough review, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE